The Fourth District Appellate Court of the State of Illinois has reconvened. The Honorable Thomas M. Harris presiding. Good morning, counsel. We're on the record in case number 4-22-1101, People v. Brandon Heibenthal. Counsel, could you state your names for the record, please? Good morning. My name is Catherine Donahoe on behalf of Brandon Heibenthal. Good morning. My name is Diane Campbell. I'll be representing the People of the State of Illinois. Okay. Thank you. Ms. Donahoe, is it pronounced Heibenthal? It is pronounced Heibenthal. Okay. Thank you. Ms. Donahoe, you may proceed with your argument. Good morning. May it please the court, I intend to focus on the first two arguments raised in the briefs, but I can also answer any questions the court may have about the excessive sentence claim. Presiding Justice Harris, may I just interrupt for one moment? I noted that there was a motion to cite additional authority, and was the court going to address that before argument today? Thank you. We needed to do that, and there was a motion to cite additional authority. Is there an objection to that motion? I have no objection. All right. Without objection, the motion will be allowed. Thank you, Justice Zino. Thank you. And Ms. Donahoe, you may proceed. Thank you. Your Honors, this is an unusual case. This case began with Mr. Heibenthal's sister, Mallory, and a single cannabis plant. That single plant was observed by a police officer who reviewed Mallory's recorded video call with a jail inmate, and it led to a search warrant for Mr. Heibenthal's home. That search led to the discovery of cannabis plants, and also a very small amount of crystallized methamphetamine on a glass dish in Mr. Heibenthal's bathroom. Mr. Heibenthal was charged with a Class III felony for that methamphetamine. He was embarrassed. According to the sentencing record, he'd been sober for nearly a decade following the tragic death of his girlfriend. He hired an attorney, and he initiated plea negotiations. He was prepared to take responsibility for his possession of that Class III amount of methamphetamine. But next to that dish that had a tenth of a gram of methamphetamine, there was a glass pipe in a Pyrex dish. It was soaking in about seven ounces of liquid. Neither that pipe nor the liquid was incorporated into the initial charges, but six months later, in the middle of plea negotiations, Mr. Heibenthal and his counsel were stunned when the state added two additional Class X charges, reporting that the lab had now tested that liquid and weighed it and determined it was seven ounces or 160 grams of a substance that tested positive for the presence of methamphetamine. The state charged him with Class X, and he's serving a 15-year prison sentence for that offense. In this appeal, we're challenging several trial court rulings that cut off Mr. Heibenthal's defense. First, the trial court refused to conduct a Franks hearing when Mr. Heibenthal challenged the veracity of the police affidavit used to get the search warrant. And second, the trial court erroneously barred Mr. Heibenthal from presenting a defense to the charges based on that liquid in the Pyrex dish, where he sought to prove that the pipe was soaking in a cleaning solution that did not fall within the definition of a substance containing methamphetamine. And so first, turning to the motion for a Franks hearing, Officer Wilke obtained a search warrant for my client's home after swearing to an affidavit stating that Mallory displayed that and that a detective, Detective Hinkle, told him Mallory did not have a valid medical marijuana card. Because she appeared to be growing cannabis plants, if she didn't have a valid card, there was probable cause she was in violation of the Cannabis Control Act. However, in a motion for a Franks hearing, the defense presented evidence that Mallory did in fact have a valid The motion included Mallory's affidavit, swearing she had a valid card and a copy of the card itself issued by the Illinois Department of Public Health. That was enough to satisfy the preliminary showing required for the trial court to conduct a Franks hearing. And all we're asking for today is that the court remand for the Franks hearing so that Mr. Heibenthal can have the opportunity to demonstrate the falsity of the affidavit. Ms. Donahoe, may I interrupt you then? And when we're now at that point where we're talking about the preliminary showing that's necessary in order to obtain a Franks hearing. And is it your position that at the preliminary showing stage that the defendant only has to establish a false statement and that without the false statement, there would not have been probable cause for issuance of the warrant? That's correct, Your Honor. Under Franks v. Delaware, the defendant needs to make a substantial showing that there is a false statement either knowing and intentionally included or with reckless disregard. And so the next and that is then the next part of my question. Are you, is it your position that a defendant does or does not have to also establish a preliminary showing that the false statement was made with reckless disregard? Is that part of the preliminary showing as well? It's part of the preliminary showing, but the defendant only needs to show that with something more than a mere denial and to make an offer of proof, which Mr. Heibenthal did here. The standard at an actual Franks hearing is a preponderance of the evidence. So we don't, he, the Supreme Court has held that the standard at that preliminary showing is something less than that. And it's based on just, it's a pleadings-based inquiry. We look at the defendant's motion. We look at the warrant affidavit and any offer of proof made by the defense. And here we have objective evidence that Mallory in fact had a medical marijuana card that was valid at the time of the search warrant. And. Well, and so we're drilling down to a question that I really have, which is when you get to a preliminary showing of a reckless disregard for the, uh, uh, uh, uh, uh, accuracy of the, uh, the statement, the trial court in this case found that it wasn't, uh, uh, uh, detective, uh, well, shoot, there's Wilkie and what's the detective's name? Detective Hinkle. Hinkle. It wasn't detective Hinkle's, uh, statement that, uh, is the subject of the, uh, reckless disregard inquiry. Uh, it was, uh, Wilkie's, uh, and found that, uh, uh, Wilkie could justifiably rely on, uh, uh, the detective's statement. Um, uh, but on appeal, you're arguing that, uh, it's the detective's statement as well, uh, that, uh, uh, uh, could be inquired into. And I would simply like to know, um, beyond the footnote in Frank's, uh, is there, and you also cited to USV Pritchard, the seventh circuit case, um, is there case authority that directly answers that question, uh, regarding that second layer of a, uh, uh, government, uh, agents, uh, um, uh, reckless disregard, I'll say. Yes, your, your honor, I scoured Westlaw looking for an Illinois case that made that really explicit. I didn't find anything that wasn't, that's not included in the briefs one way or the other. However, uh, here, it seems like the trial court got confused between the distinction between a civilian informant and a police informant or a governmental informant. Frank's explicitly uses the language that we look at the affiant officer and he's, he's not accountable, uh, for if he innocently includes a misstatement provided by a non-governmental informant. And it's important to remember that the fourth amendment protects us from intrusion by the state. So that is why we treat police informants differently from a civilian informant or a confidential informant, which are what most of the cases you'll find in Illinois discuss. Uh, so Frank's applies when one police officer deliberately or recklessly misrepresents information to a second police officer. And then that officer innocently includes that information in his affidavit. And that's, that's consistent with Frank's. Frank's used the term non-governmental informant, but in the context of Frank's, there were civilian informants and it did not have, uh, elaborate on the type of scenario we have here, but, but, but they specifically said they were referring to non-governmental informants. And the purpose of Frank's is to deter police misconduct. So while that one line, uh, about the government not insulating one officer's deliberate misstatement by relaying it through an officer affiant personally ignorant of its falsity, your honor is correct that that's in a footnote, but that wasn't the subject of that particular case. It is the subject of this case. Uh, and officer Wilkie, uh, however, he came to include that statement from detective Hinkle. These were statements by government officers and Mr. Hiebenthal is just asking for the opportunity to explore this and present evidence in a Frank's hearing, uh, at this stage. I was going to ask about the address error. Um, that plays a couple of ways here because if she's not living there, even with the medical card, she has, uh, she's got some issues, right? So tell us where the address issue plays in terms of understanding its impact on probable cause. Uh, well, under Frank's, we have to set aside the challenge statements. And that was an additional false statement alleged, uh, in the defense filing, but we have to set it aside. And the problem here is the trial court decided to pick and choose, well, if this is true and that's not true, then there was still probable cause. Uh, it's also worth pointing out that officer Wilkie's warrant affidavits specifically said there was probable cause of a violation of the Cannabis Control Act. And what the state is arguing on appeal and what the trial court suggested was that she was violating the Cannabis Tax and Regulation Act by not being in compliance with the way she was growing the cannabis, which is, which is just really not what officer Wilkie was getting after with that affidavit. Uh, so we, we, this just needs to get to a Frank's hearing. And if at that hearing it's determined that there was still probable cause, uh, based on what was true and what wasn't true, then that will happen at that stage. But at this preliminary stage, we have to set aside these misstatements, uh, and just view whether there was probable cause without picking and choosing which ones are helpful to the state and which ones are helpful to the defense. Thank you. Um, and just to, uh, address a couple of the arguments the state has made. The review, the standard of review, uh, as clearly stated in chambers is de novo. So this court is in the same position as the trial court, just it's a pleadings-based inquiry. Uh, we look at the motion and the supporting documents just to see if there is a substantial preliminary showing, which chambers described as more than a mere denial, uh, more than a mere request to cross-examine the warrant affidavit affiant. It's, it's just, um, this early stage that the reason it exists is we don't automatically grant a Frank's hearing in case there's a spurious claim that we want to wash out. But in this case, uh, we have pretty objective, clear evidence that there is a misstatement in this affidavit because Mallory had a valid card. And also the state has argued that probable cause existed without even that false statement because of her not being in compliance, but we cannot look to the evidence that was subsequently recovered in this through the search warrant. And all the officer Wilkie saw was a single cannabis plant on display discussion of plant cultivation. That, that enough, that itself is not probable cause. Uh, we don't, we don't know how that plant came to be there, how many she had there at that time, just based on, uh, what the court had in front of it at the time, there was no probable cause. So didn't the trial court need to have that video, uh, introduced in evidence to have the information that needed to actually to make the findings that did that, that the video could have been introduced at the Frank's hearing, uh, under chambers in the Illinois cases. This is a factual disputes related to the video for purposes of the preliminary showing this at this, the Mallory had disputed the suggestion that she had used the word can cannabis, uh, the conversation and the trial court resolved that with the state and the defense by saying, well, she held it up. The officer had the training to recognize the cannabis plant. So even if she didn't say cannabis, she was clearly talking about cannabis cultivation. So, you know, there were, there were no significant factual disputes based on the video, but there is a huge dispute about whether Mallory had a cannabis card. And if we set that aside, uh, we're just asking for the opportunity to demonstrate the falsity of the affidavit at a Frank's hearing. Uh, and if there are no additional questions about that issue, I'd like to discuss earlier, the police found two items in the bathroom, a glass dish with a 10th of a gram of crystallized methamphetamine, which led to a class three count of methamphetamine possession. And also this Pyrex dish that contained a glass pipe soaking in about seven ounces of an unidentified liquid. And this liquid was not incorporated into the original charges. It was six months later when the state said that it had tested positive for the presence of methamphetamine, though the amount was not quantified in the composition of the liquid was never identified. In preparing for trial, the defense intended to show that the pipe was soaking in a cleaning solution meant to dissolve methamphetamine residue from the pipe and argue that this did not constitute a substance containing methamphetamine. The defense hired a pharmacology expert, but before that expert could present any evidence in court, the trial court granted the state's motion to bar this defense in favor of a bright line rule that the phrase, a substance containing methamphetamine includes literally any amount of methamphetamine in any substance, even a minimal trace of the drug, such that the composition of the liquid is irrelevant. And the court relied on the Illinois Supreme Court's decision in People versus McCarty, which involved the byproduct of methamphetamine manufacture, which contained traces of finished methamphetamine and found that that qualified as a substance containing methamphetamine. But McCarty did not find that the composition of the substance was irrelevant. McCarty actually undertook a pretty detailed analysis of what that actual substance was, how it came to be, what its purpose was. They looked at the dictionary definition of substance, which is a material from which something is made and to which it owes its characteristic qualities. McCarty and also later this court in People versus Tilly found that methamphetamine is its ingredients, whether in its final marketable form or not. And this is partly because the manufacturing process is so hazardous that there's a danger to the public even without a usable product. Using that definition of substance, the composition of the substance has a direct bearing on whether the substance is included in the definition of a substance containing methamphetamine, which again is not explicitly defined in the statute. It doesn't have to be usable, consumable, or marketable methamphetamine, but it has to be a material from which something is made and owes its characteristic qualities. So in this case, Mr. Haventhal wanted to argue that including the full weight of this liquid, this unidentified liquid that was never tested by the state for what its components were, to include it even if it's a cleaning solution meant to destroy the presence of the residue on the pipe is technical to the point of absurdity. And under this interpretation, as we argued in the brief, Mr. Haventhal's criminal liability would increase ounce by ounce as he poured more of a cleaning agent into that Pyrex dish. And what happens if he drops it into a swimming pool and that still tests positive for a nanogram of methamphetamine? There has to be some limit to this. The composition of the substance cannot be irrelevant. If anything, the dissolution of the methamphetamine on the pipe decreased the danger posed by the residue by rendering it unusable. So this is a different scenario than McCarty, than Tilly. And there aren't a lot of, again, this is an unusual case, there aren't a lot of comparable examples, but we have to- Counsel, are we getting into drawing definitions that the statute hasn't given us? I mean, the statute does just say a substance containing methamphetamine, and we understand that in McCarty, we talked about or the court talked about why it was a byproduct of production. It seems like we're going a long way towards making definitions that are not given to us. Well, because the statute does not define it, we have to try to figure out that this court needs to figure out the legislature's intent. And it's, if anything, ambiguous and the rule of lenity favors the defendant in this case. But there are cases such as people who would be Kosharsky showing that the nature of the substance is relevant. And you can look at it as a case by case basis as needed. But in that case, the drugs were adulterated with the defendant's bodily fluids after balloons burst inside his abdomen. And he was not held liable for that unintentional adulteration versus somebody who has a massive amount of a substance containing methamphetamine because they were trying to manufacture it and they were unsuccessful or people versus Butler where the defendant dissolved cocaine and champagne bottles for purposes of bringing it into this country illegally and distributing it. And it still usable. And she said, I only want to be held responsible for the 29% of that liquid that tested positive for cocaine. And the appellate court said, no, because you intentionally mixed it to enable its use, marketing and importation. And this case is different. The court's interpretation of substance containing methamphetamine was overbroad, unworkable, and it's at odds with the intent of the legislature. And this court should reverse Mr. Hubenthal's Class X conviction and remand with instructions that the court allow him to present this defense based on the composition of the liquid. Thank you. Okay. Thank you, Ms. Donahoe. You'll have time and rebuttal. Ms. Kelton. Yes. Thank you, Your Honors. I will address first the Franks issue. And again, the requirement is a substantial showing of knowing an intentional or reckless disregard of the truth. That's in it does not mean truthfulness in the sense that every fact recited in a warrant is necessarily correct for probable cause may be found on hearsay and information received from an informant. That's at 2681. Truthfulness in the sense that the information is believed or appropriately accepted as by the affiant as true. That's at 2681. And they must be allegations of deliberate falsehood or reckless disregard for the truth. And those allegations must be accompanied by an offer of proof. That's at 2684. And then Pritchard explains exactly what that entails. In particular, it says at 1116, the evidentiary hearing must focus on the state of mind of the affiant. The proffered evidence must go towards showing either affiant lied or that the affiant recklessly disregarded the truth because the affiant, in fact, entertained serious doubts as to the truth of his allegation or had obvious reasons to doubt the veracity of the allegation. Again, that's at 1116. To test some of this, I think we have to first establish whether we're just talking about the affiant or in a case such as this one, whether we're talking about the we don't launder false information by giving it from one officer to another, right? We still have to look at what that officer's basis was for saying she didn't have a card. The court addresses that further. It repeats the same, basically the same information at 1118. And it says that where one government agent deliberately or reclusively misinterprets information to a second agent who then innocently includes the misrepresented in an invitation. But then it repeats that the affiant's state of mind, which is critical, and the court repeated that the applicant made no showing, much less a substantial showing, that agent Sikogalski knew or had reason to believe that the statements made by his sources were false. That's at 1119. Sources, but are we talking about government sources? Just before that, the court had repeated the fact about getting information from a second agent and the first agent then innocently misrepresents. And that's at 118. And then the next statement is at 119. So I think it does incorporate and looks critically, most critically, at the affiant's state of mind and whether he had a reason to make that finding that there was no indication. There is nothing inherent in the presentation, the information, to cause anybody to have pause or question whether it was true or not. The court made that statement at 142. We also should consider the type of information, right? Most of us don't just know this about other people. There'd have to be some reason to know or some database consulted. For an officer to rely on another officer saying she does have a medical card or does not have a medical card, how does he know that unless we know he looked up a database or had some prior experience with her? It seems like a very trusting conclusion to say, oh, you say she doesn't have a medical card, then I guess she doesn't. Well, again, I think this goes to, it doesn't include an innocent mistake. There's nothing in the affidavit that says actually how Detective Hinkle got the information. How is the defendant going to know that? Excuse me? Well, he can read the affidavit. I mean, obviously, he read it and- We still don't know where that information, which turned out to be wrong, came from. Again, at the substantial showing that's required, the burden is on the defendant to show reckless disregard or intentional or knowing falsity. And in this case, the evidence he introduced was the medical marijuana card of Mallory, and then he also argued about the address. Surely, in this case, if the defendant himself had a medical marijuana, the defendant would have introduced that card at that time as part of his showing of reckless disregard or knowing or intentional mistake. I don't think that's relevant, is it? We're talking about whether she had a medical card because that was the false information. Okay. Then- Oh, right. But you also look then at the fact that the other incorrect statement was that she lived there. So, what we know in the remaining information is that Wilkie recognized the residents from patrolling in the area, so he knew the address. Mallory displayed the cannabis plant. My opposing counsel had said, we don't know how many, but Officer Wilkie said that Mallory said she was growing multiple plants. She had fertilizer, which she showed. She had a growth log, which she showed, and the plants were not in a secure location. If you are growing your marijuana at home, there are certain restrictions. Again, there's no evidence that the defendant, who was the homeowner, had any medical marijuana card. So, again, this is a showing for probable cause, and there has to be a substantial showing and the defendant's burden to show intentional or knowing falsity or reckless disregard. I don't think that is shown here. Okay. But you understand that whenever the law puts the responsibility on one party to make an allegation about the state of mind of another or the conduct of another that they aren't privy to, you have to be reasonable in what you expect the alleging party to know, right? Clearly, the defendant could have called either Officer Wilkie or Detective Hinkle, either of them, if he wanted to show something like that. She could at a Frank's hearing, but this is, as counsel notes, is primarily considered a pleading endeavor, correct? Well, I mean, if you look then at what he did submit, which was Mallory's medical marijuana, I think it is a logical inference that the defendant then doesn't have one. And the cannabis is at the defendant's home. It is not in a secured location. So, again, there's sufficient probable cause. But it sounds like you're saying that the defendant should have proceeded with a Frank's hearing in order to get a Frank's hearing. We're only talking about what is needed to allege, something short of a preponderance, that provides the basis for having the Frank's hearing. I think what we need to consider is that, and this is from Frank's, allegations of negligent or innocence mistakes are insufficient. That's at 2684. And here, there's no showing that, you know, perhaps he typed in Mallory's name incorrectly. We don't actually know that he checked the database. Perhaps he knew from, or he had heard, you know, from other sources, but there's no indication that it was anything other than an innocent mistake. Would that have to be alleged or would that be the subject of a Frank's hearing? Well, you have to make your substantial preliminary showing. So, yes, at this point, in order to make that, and when it's your burden, your allegations have to be more than, as I said, negligence or an innocent mistake. Well, how would the defendant know what Detective Hinkle did in searching for the database? There'd be no way to make any allegation in that regard. Well, there's also the fact that Mallory was brandishing one plant and saying she had multiple plants that she was growing. They had been germinating for six months. They're not in a secured location. So, anybody in that home is violating their right to grow marijuana in their home. That's a clear, sufficient, probable cause showing for the warrant. I'm sorry. Could you state that again? What is it that just simply based on the video alone would, and putting aside what was stated in regards to Mallory's cannabis cart, just looking at the video alone, that was sufficient for the probable cause determination? That's not exactly what I said because, as counsel noted, the video was not actually shown at the hearing. I don't think there's an indication that the trial court itself saw the video. What we have are Officer Wilkie's representations on what he saw and heard in the video. Again, it would have been helpful because there were discrepancies as to whether she had said cannabis or not, or cannabis said Teva or not, and other things. But what Officer that she was displaying, that Mallory said she had multiple plants she was growing, there's evidence due to the fertilizer. She can have up to five, right, if she's legal? Yes. So, what does that tell us, that she had multiple? Well, there's, however many she has, they have to be in a secure location. And Mallory was out either on the patio or the, you know, back deck, I can't remember exactly. But clearly, the marijuana is not in a secure location. Well, it has to be grown in a secure location. Could be she picked up one of the plants and was just showing it. Excuse me. Not necessarily where it was growing. Well, she also displayed her fertilizer right there, you know, in the video call at that same location. And she had her germination log. So, you know, I think it's, it's a reasonable inference that, you know, it's not all in. She didn't probably haul down her fertilizer container, haul down her log, haul down a plant to the patio so that she could have this video chat with the inmate. Ms. Campbell, are you referring to something that you saw in the video or that was claimed in the affidavit? This is claimed in the affidavit. The video itself is not in the record at all. So I have not viewed it. Your honors cannot view it. So. This wasn't your theory below, correct? The theory below was that there's a violation of the Cannabis Control Act. At the time, the officers believed that Mallory did not have a medical marijuana. Under the Frank's preliminary hearing, you have to take out that information. So if you take out the information that was inaccurate, which is that she did not have a card and that she lived there, you're left with the fact that at this residence, which is owned by the defendant himself, we have plants which are not being grown in a secured location. I think, you know, we don't know whether they're being grown. Well, she she stated that she was germinating them for six months. Again, she's got the fertilizer can there right next to her. And Wilkie says she showed the fertilizer and she talks about growing them. So I think, you know, again, this isn't proof beyond a reasonable doubt for a trial. What you have to do is have a substantial showing of knowing and intentional falsity or reckless disregard for the truth. And again, allegations of negligence or an innocent mistake are insufficient. And I think that's clearly what we have here. At worst, it was negligence. I'd like to point out that defendant. How do you know that? I mean, how do you know that? That at worst it was negligence? I mean, the example you gave before might be negligence. Well, I miskeyed her name in the database. That could be negligence. If you say, well, I didn't check the database. I'm not sure that's negligence. I think that's probably recklessness. But we're not deciding that yet because we're not at the Franks hearing. Again, I think, you know, when you look at the totality where defendant is then refuting and attempting to, you know, implement the protections of home growth of medical marijuana, you then have to take the good for the bad. And that requires, you know, a secure location. And I think the trial judge, you know, could make, could logically make that decision. Was it argued to the trial judge? I, because of the fact that they were concentrating on Mallory's lack of card, I don't know if it was raised. I certainly think that if you're imposing de novo review, then, you know, you can make that finding. And again, the trial court specifically stated that there was nothing inherent in the presentation of the information to cause anybody to have pause or to question whether it was true or not. The court makes that finding at 142. So I think, you know, in particular, in Pritchard, where it's talking about, it's the state of mind of the affiant that you're looking at. That is what you're looking at. Unless the information is coming from another governmental agent that does not purify the information to just pass it through that way. I think at Pritchard, the court repeats that about the government agent has to deliberately or recklessly mispresent information to a second agent who then innocently includes it. And then it repeats that it's the affiant state of mind that is critical. And that the court repeats that the appellant made no showing, much less a substantial showing that agent Segalski knew or had reason to believe that the statements made were false. That is at 119. And I think when that's followed by that talk about other government agents, that clearly it is, you're looking mainly at the affiant, which is Wilkie's state of mind. And he had no reason to disbelieve that information or believe it was false. And the trial court specifically made that finding. Ms. Gamble, if we were to say that the trial court should have been examining Detective Hinkle's state of mind and saying that the informing agent's state of mind is relevant in this first Illinois court of review to say that? Well, I think that that holding would be contrary to Pritchard, where the court repeated that the appellant made no showing, much less a substantial showing that agent Segalski knew or had reason to believe that the statements made by his source were false. So I think that that would be a serious and grievous extension of what Pritchard held. And again, the defendant in her reply brief at page four said that the issue she raises is not simply that Officer Wilkie was required to double check information provided by Detective Hinkle. She cites no case law to support the fact that an officer has to double check all the information. And again, can I finish my comment? Again, it's that, sorry, allegations of negligence or innocent mistake are insufficient and there's nothing to show that it was other than that. Did your honors want me to address argument two about the statute? No, Ms. Gamble, you are out of time. Thank you. Ms. Donahoe, you may present rebuttal argument. Ms. Donahoe, you are muted. Thank you, your honor. So I'd like to point the court's attention to paragraph 40 in People vs. Chambers, in which the Illinois Supreme Court said that courts should not apply between a governmental informant versus a non-governmental informant. But in Chambers, the informants were confidential informants that were presented to the magistrate at the time of the warrant application. And even in that case, because of the showing made by the defense, the Supreme Court found that a Frank's hearing was necessary because even though there was really no if anyone had provided false information, it seemed to come from those confidential informants. So even in that case, which the court found that a Frank's hearing was warranted. And again, we don't know where this information came from. We don't know how that statement, Mallory does not have a valid cannabis card, came to be. And that's something that needs to be that we can't rule out an innocent mistake. But for purposes of this early showing, Mr. Heventhal presented not just a denial by himself or by Mallory, we presented objective evidence, a valid cannabis card issued by the Illinois Department of Public Health that was in effect at the time. These aren't just allegations that it's false. And also, as for whether there was probable cause when we set these facts aside, the state, I think mistakenly, counsel said a couple of times that Mallory had been growing these seedlings for six months, but it was actually five weeks. So these are small seedlings, they may not have sprouted through the soil in the first week. We know nothing from Officer Wilkie's affidavit and his description of the video about how the plants were stored. We know that she referred to multiple plants. So there may have been two plants, there was a fertilizer can that she showed. The suggestion from the description of this call is that she was asking the inmate of the jail for advice about how to grow. She may have brought the plant with her that day if she didn't live there. She may have taken it out of secure storage to show it to him and discuss how to grow these plants well. And it bears repeating that Officer Wilkie said she was in violation of the Cannabis Control Act. And the state's arguments now are about how she would have been in violation of the Cannabis Tax and Regulation Act. But even that is ambiguous. If you look at the requirements in the statute, which was briefly addressed below, the cannabis cultivation may occur on residential property, lawfully in possession of the cultivator, or with the consent of the person in lawful possession of the property. They can be tended by registered patients or their authorized agent for brief periods. So there's some ambiguity here. Nothing in Officer Wilkie's description of the video supports a probable, it doesn't clearly support a probable cause finding. We just need a Frank's hearing so that all of this can be explored. The questions can be answered. We can figure out where this information came from, what Officer Wilkie's state of mind was, what Detective Hinkle's state of mind was. And at this point, that's what we're asking this court to do. All right. Thank you, Ms. Donahoe. Thank you both. The case will be taken under advisement and the court will issue a written decision.